UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| SCOTT E. GAMMONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:21-CV-173-TAV-DCP |
| | ) |
| ADROIT MEDICAL SYSTEMS, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

This matter is before the Court on Plaintiff's Motion for Leave and Motion to Compel [Doc. 82]. Defendants responded in opposition to the motion [Doc. 85], and Plaintiff filed a reply [Doc. 86]. The motion is ripe for adjudication. For the reasons set forth below, the Court **DENIES** Plaintiff's motion [**Doc. 82**].

### I.  BACKGROUND

The Court detailed the allegations in this case in a previous Memorandum and Order [Doc. 35]. To summarize, Plaintiff filed this action pursuant to the anti-retaliation whistleblower protection provision of the Taxpayer First Act ("TFA"), 26 U.S.C. § 7623(d)(2)(A)(ii); the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304; and Tennessee common law [Doc. 1 ¶¶ 1 & 9]. Plaintiff generally alleges that in light of Gene Gammon's declining health, Defendants Grazyna Gammons ("Ms. Gammons") and Kelley Patten ("Ms. Patten") engaged in illegal activity by submitting false expense reports and using Adroit Medical Systems, Inc's ("Adroit") funds for personal items [*Id.* ¶¶ 18–36]. Plaintiff reported these activities to law

enforcement authorities in 2019 and in early 2020 and was advised to file an emergency conservatorship to protect his father and Adroit [*Id.* ¶ 35]. On March 5, 2020, Plaintiff filed a petition for a conservator to act in Mr. Gammons's corporate capacity and majority shareholder of Adroit [*Id.* ¶ 38]. The petition detailed Plaintiff's reports to state and federal authorities [*Id.* ¶ 39]. The court granted a limited conservatorship appointing Plaintiff as his father's emergency conservator to exercise Mr. Gammons's corporate capacity and president and majority shareholder of Adroit [*Id.* ¶ 40]. On March 10, 2020, the court conducted a hearing on the conservatorship, and the court dismissed the petition [*Id.* ¶ 45]. Subsequently, on March 11, 2020, Adroit's shareholders conducted a special meeting and removed Plaintiff from the board of directors [*Id.* ¶ 46]. On March 12, 2020, Ms. Gammons and Mr. Gammons sent a jointly signed letter terminating Plaintiff [*Id.* ¶ 47]. Plaintiff filed his Complaint on May 5, 2021.

Relevant to the instant dispute, the Court allowed Plaintiff to conduct a forensic examination of Ms. Gammons's and Ms. Patten's cellular phones in November 2022 [Doc. 51]. This forensic examination has been the subject of multiple disputes [*See* Doc. 77]. The Court allowed Plaintiff another forensic examination in February 2023, which is the subject of the instant motion. The forensic examiner uncovered three text messages ("Text Messages") between Ms. Patten and her husband, Clarence Patten ("Mr. Patten"). Defendants claim the Text Messages are protected by the attorney-client privilege and Ms. Patten did not waive the privilege when she sent the Text Messages to her spouse. Specifically, Defendants' privilege log provides as follows:

| Dates | Document |
|---|---|
| 3/9/2020 | Kelley Patten's text with Clarence Patten regarding preparation for meeting with personal and corporate attorney, W. Edward Shipe. |
| 3/10/2020 | Kelley Patten's text with Clarence Patten discussing action items from prior meeting with personal and corporate attorney, W. Edward Shipe. |
| 3/10/2020 | Kelley Patten's text with Clarence Patten regarding gathering court documents for personal and corporate attorney, W. Edward Shipe. |

2

[Doc. 83 p. 2].

On March 9, 2020, Attorney Edward Shipe, Defendants, and Mr. Patten met regarding the conservatorship proceeding that Plaintiff initiated [Doc. 83-4 p. 3]. Mr. Patten was not an employee of Adroit at this time [Doc. 23-10 ¶ 2]. In addition, Mr. Patten was not personally represented by Attorney Shipe [Doc. 83-4 p. 3]. Mr. Patten became a member of Adroit's board of directors on March 11, 2020 [*Id.* at 2]. During his deposition, Mr. Patten testified that he learned that he would be asked to become a board member in the late morning of March 11, 2020 [*Id.*]. During his first board meeting on March 11, 2020, Mr. Patten voted to terminate Plaintiff [*Id.*]. According to Mr. Patten's deposition, he met Ray Pinkstaff ("Pinkstaff"), Adroit's counsel, at the board meeting but never had communications with Pinkstaff prior to becoming a board member [*Id.* at 4].

Defense counsel, Attorney Shipe, filed a declaration in this case, stating as follows:

> 1. My name is W. Edward Shipe. I am over eighteen (18) years of age and competent to testify. I am counsel for the Defendants in this action. I have personal knowledge of the facts stated herein.
>
> 2. I was retained to represent Gene Gammons in connection with the conservatorship action filed by the Plaintiff, Scott Gammons.
>
> 3. At that time, Adroit Medical Systems, Inc., Grazyna Gammons, Kelley Patten, and Gene Gammons, and Clarence Patten were represented by corporate attorney, Ray Pinkstaff, for their involvement with Adroit.
>
> 4. Following the state court's dismissal of the conservatorship, I began jointly representing Adroit Medical Systems, Inc., Grayzna Gammons, Kelley Patten, Gene Gammons, and Clarence Patten.
>
> 5. Since that time, I have represented Adroit Medical Systems, Inc., Grazyna Gammons, Kelley Patten, Gene Gammons, and Clarence Patten in all matters related to Plaintiff's takeover of Adroit, termination, and present lawsuit.

> 6. I have reviewed the challenged text messages. They all related to my meetings with Kelley Patten, the other Defendants, and attorney Ray Pinkstaff, during which we discussed confidential matters related to ongoing and anticipated litigation.

[Doc. 85-1 ¶¶ 1–6].

Plaintiff claims that "Defendants waived any information communicated between Defendants and Attorney Ed Shipe by permitting Mr. Patten to attend the March 9, 2020, meeting despite Mr. Patten not being Mr. Shipe's client nor being a [b]oard [m]ember as of that date" [Doc. 83 p. 4]. In addition, Plaintiff states that Ms. Patten "waived any privileged communications by disclosing the contents of the same to Mr. Patten who, again was not Mr. Shipe's client nor a [b]oard [m]ember before March 11, 2020" [*Id*.]. Thus, Plaintiff asserts that any purported claim of attorney-client privilege has been waived.

Defendants state that given the emergency conservatorship, "it was reasonable as of March 5, 2020, for Gene Gammons, Grazyna Gammons, Kelley Patten, and Clarence Patten to seek legal guidance" [Doc. 85 p. 1]. In a footnote, Defendants claim that "[o]n March 9, 2020, Clarence Patten was represented, along [with] the other individual defendants, by attorney Ray Pinkstaff" [*Id*. at 5 n.3]. At that time, Attorney Shipe represented Gene Gammons for the purpose of the emergency conservatorship, but Defendants claim that the "two groups of clients and counsel worked together on a joint defense" [*Id*.]. Defendants argue that the circumstances surrounding these messages prove the application of the attorney-client privilege, including that Mr. Patten "is and was part of the core group of individuals charged with running the operations of Adroit[,]" and his involvement made him a potential co-defendant [*Id*. at 12]. Defendants add that even if the Court disagrees that the attorney-client privilege independently applies to Mr. Patten, Defendants have not waived the privilege because "[a]n individual does not waive the attorney-

4

client privilege by sharing the contents of the communications with her spouse [*Id.* (citation omitted)].

## II. ANALYSIS

The Court has considered the parties' filings in this matter, and for the reasons explained below, the Court **DENIES** Plaintiff's motion [**Doc. 82**].

Jurisdiction in this case is governed under 28. U.S.C. § 1331, and therefore, questions of privilege are guided by Federal Rule of Evidence 501. Fed. R. Evid. 501; *Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998) ("Questions of privilege are to be determined by federal common law in federal question cases") (citing Fed. R. Evid. 501); *see also Prudential Def. Sols., Inc. v. Graham*, 517 F. Supp. 3d 696, 701 (E.D. Mich. 2021) (stating the same). The attorney-client privilege protects "confidential communications between a lawyer and his client in matters that relate to the legal interests of society and the client." *In re Grand Jury Subpoena*, 886 F.2d 135, 137 (6th Cir. 1989) (quotation omitted). "The privilege's primary purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005); see *also Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) ("The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.").

The elements of the attorney-clients are as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*Reed,* 134 F.3d at 355–56 (citation omitted). "The burden of establishing the existence of the privilege rests with the person asserting it." *Prudential Def. Sols.,* 517 F. Supp. at 702 (quoting *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999)). "The privilege is 'narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit.'" *Id.* (quoting *Ross*, 423 F.3d at 600) (other quotation omitted).

There does not appear to be a dispute that the Text Messages are attorney-client privileged. [Doc. 83 p. 4]. Instead, Plaintiff argues that Defendants waived the privilege by permitting Mr. Patten to attend the meeting on March 9, 2020, and when Ms. Patten later disclosed the contents of the same to Mr. Patten via the Text Messages. Defendants respond that the attorney-client privilege extends to Mr. Patten. Under the circumstances of this case, the Court is not entirely persuaded that the attorney-client privilege extends to Mr. Patten. For instance, Defendants assert that the Supreme Court "extended attorney-client privilege for corporate clients to communications by lower-level employees regarding matters within the scope of their corporate duties made at the direction of their superiors and with knowledge that the information was being sought in order to secure legal advice" [Doc. 85 p. 8 (citing *Upjohn*, 449 U.S. at 383)]. But prior to March 11, 2020, Mr. Patten was not an employee of Adroit—only having served as a subcontractor "as needed" [Doc. 23-10 ¶ 2]. Further, Defendants have not presented any evidence that the subject communications involve "matters within the scope of [Mr. Patten's] corporate duties[,]" likely because he did not have any corporate duties until March 11, 2020. *Upjohn*, 449 U.S. at 383.

Defendants also rely on *Dialysis Clinic, Inc. v. Medley*, 567 S.W.3d 314, 324 (Tenn. 2019), stating that "[t]he Tennessee Supreme Court recently took an even broader approach, protecting communications with non-employee third parties who assist corporate clients" [Doc. 85 p. 8]. In *Dialysis Clinic Inc.*, the court articulated non-exclusive factors to determine whether a third party-

6

nonemployee is the functional equivalent of an employee for purposes of the attorney-client privilege as follows:

> whether the nonemployee performs a specific role on behalf of the entity; whether the nonemployee acts as a representative of the entity in interactions with other people or other entities; whether, as a result of performing its role, the nonemployee possesses information no one else has; whether the nonemployee is authorized by the entity to communicate with its attorneys on matters within the nonemployee's scope of work to facilitate the attorney's representation of the entity; and whether the nonemployee's communications with the entity's attorneys are treated as confidential.

*Dialysis Clinic, Inc.*, 567 S.W.3d at 324. Defendants state that Mr. Patten "was a confidant and deeply involved in the corporation—and the family's—affairs . . . perform[ing] specific roles on behalf of Adroit; acted as a representative of Adroit; possessed information no one else had; was authorized by Adroit to communicate with its attorney and facilitate representation" [Doc. 85 p. 12]. But there is no evidence of such involvement before the Court. The only evidence before the Court is that Mr. Patten "was not an employee of Adroit at the time of Scott Gammons'[s] termination, [but he] previously acted as a subcontractor to Adorit, as needed" [Doc. 23-10 ¶ 2]. His declaration provides no detail regarding his extensive involvement in Adroit's affairs, as Defendants' brief suggests, until after he was appointed to the board on March 11, 2020. And during his deposition, Mr. Patten testified that he became aware that he would be a board member on the morning of March 11, 2020—two days after the March 9 meeting [Doc. 83-4 p. 2].

Defendants also assert that "[p]erhaps most relevant is the application of attorney client privilege to *potential co-defendants*, even those who ultimately do not execute a joint defense agreement" [Doc. 85 p. 9 citing *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 213 (Tenn. Ct. App. 2002)]. In *Boyd*, the court explained:

7

> To carry its burden, the proponent must demonstrate: (1) that the otherwise privileged information was disclosed due to actual or anticipated litigation, (2) that the disclosure was made for the purpose of furthering a common interest in the actual or anticipated litigation, (3) that the disclosure was made in a manner not inconsistent with maintaining its confidentiality against adverse parties, and (4) that the person disclosing the information has not otherwise waived the attorney-client privilege for the disclosed information.

*Boyd*, 88 S.W.3d at 214–15. Defendants state that "[Mr.] Patten's deep involvement in the family corporation also made him a target" [Doc. 85 p. 12]. Again, there is little, if any, evidence of Mr. Patten's deep involvement in the family corporation. Defendants state that "Clarence Patten made no secret that he was not on the Plaintiff's side, actively working with the individual defendants as they restored Mr. Gammons['s] liberty and retook the company" [Doc. 85 p. 12 (citing Doc. 23-10 ¶ 8)]. In paragraph 8 of Mr. Patten's declaration, he explains the reasons why he voted to terminate Plaintiff during the board meeting on March 11, 2022—which was after Ms. Patten sent the Text Messages. At the time Ms. Patten sent the Text Messages, according to Mr. Patten's deposition, he had no knowledge that he would become a board member. Given that he was simply a subcontractor for Adroit "as needed," it is unclear how communications were disclosed due to anticipated ligation against him.[1] *See Cooey v. Strickland*, 269 F.R.D. 643, 652 (S.D. Ohio 2010)

---

[1] In a footnote, Defendants assert that "[o]n March 9, 2020, Clarence Patten was represented, along with the other individual defendants, by attorney Ray Pinkstaff" [Doc. 85 p. 5 n.3; see also Doc. 85-1 ¶ 3]. Attorney Shipe represented only Gene Gammons at that point, but the "two groups of clients and counsel worked together on a joint defense" [Doc. 85 p. 5]. The Court finds it reasonable that the two groups worked together given that Plaintiff filed an emergency conservatorship over Mr. Gammons to have control of Adroit. But it remains unclear to the Court whether Pinkstaff, the corporate counsel for Adroit, represented Mr. Patten during this time. Attorney Shipe states that Pinkstaff represented Mr. Patten given his involvement with Adroit [Doc. 85-1 ¶ 2]. But Mr. Patten was not on the board, was not aware he was going to be on the board until March 11, 2020, and had never communicated with Pinkstaff prior to the first board meeting [Doc. 83-4 pp. 2 and 4].

(finding that the common interest doctrine applies only to protect communications regarding the common interest and intended to further that interest).

Further, while the Court agrees with Defendants that the attorney-client privilege protects communications "where legal advice of any kind is sought from a professional legal advisor[,]" there is no evidence before the Court that Mr. Patten was seeking legal advice at the relevant time [Doc. 85 p. 9 (quoting *Reed*, 134 F.3d at 355 (other citation omitted))]. According to Mr. Patten, the meeting on March 9, 2022, was "for Gene Gammons" [Doc. 83-4].

Despite the above, and without finding whether there was a waiver of the attorney-client privilege, the Court finds the Text Messages are protected. As several other circuits have held, "a disclosure of documents to one's spouse does not waive the attorney-client privilege." *United States ex rel. Scott v. Humana, Inc.*, No. 3:18-CV-61-GNS-CHL, 2019 WL 7404032, at *5 (W.D. Ky. Sept. 24, 2019) (citing *Kirzhner v. Silverstein*, 870 F.Supp.2d 1145 (D. Colo. 2012); *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint.*, Inc., No. 10-CV-02868-MSK-KMT, 2014 WL 3732943, at *3 (D. Colo. July 29, 2014) (forwarding an email to spouse did not act as a waiver of the attorney client privilege); *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 406 (D. Kan. 1998) ("[I]t is not a waiver when the disclosure is made in the course of another privileged relationship, as when the client tells his wife that he told his lawyer.")).

The Court further finds that Mr. Patten's presence at the March 9, 2020, meeting does not necessarily constitute a waiver of all communications stemming from the meeting. Waiver of privileged communications can waive other communications relating to the "same subject matter." *In re Grand Jury Proceedings*, Oct. 12, 1995, 78 F.3d 251, 256 (6th Cir. 1996). "This rule seeks to avoid the unfairness that might result from selective disclosure while, at the same time, upholding the privilege and preserving the interests it protects from excessive exposure." *United*

*States v. Skeddle*, 989 F. Supp. 905, 908 (N.D. Ohio 1997). In determining the scope of any alleged waiver, courts are "guided by fairness concerns." *In re Grand Jury Proceedings*, Oct. 12, 1995, 78 F.3d at 256. "[R]ealizing that fairness is at the heart of the waiver issue, courts have generally held that the 'same subject matter' is to be viewed narrowly." *Skeddle*, 989 F. Supp. 909 (citing cases).

Keeping in mind the doctrine of fairness and that the "same subject matter" is to be viewed narrowly, the Court finds that the scope of any waiver of the attorney-client privilege does not cancel the separate marital communications privilege.[2] Plaintiff's argument to the contrary unnecessarily broadens the scope of the subject matter waiver, especially given that there are no concerns regarding selective disclosure.

## IV. CONCLUSION

For the reasons explained above, the Court **DENIES** Plaintiff's Motion for Leave and Motion to Compel [**Doc. 82**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

---

[2] Plaintiff also asserts that Ms. Patten waived any potential spousal privilege by failing to invoke the privilege with respect to all text messages exchanged with her husband that were produced in discovery, but he cites no authority for the Court to find such a broad waiver. He further asserts that Ms. Patten waived any attorney-client privilege via her communications with her brother, but Plaintiff acknowledges that he can only "speculate as to what may have been discussed by phone" [Doc. 86 p. 7]. Finally, he claims that defense counsel originally stated that she was withholding the text messages based on the attorney-client privilege "not because they are with Mr. Patten[,]" and therefore, Defendants have waived the spousal privilege [*Id*. at 6 (citation omitted)]. The Court does not find that defense counsel's statement operates as a waiver to the spousal privilege given Defendants' argument that the Text Messages are protected by the attorney-client privilege, and they simply argued that this privilege had not been waived in light of the spousal privilege.