UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

SCOTT E. GAMMONS,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        No.:   3:21-CV-173-TAV-DCP
                                     )
ADROIT MEDICAL SYSTEMS, INC.,        )
GRAZYNA H. GAMMONS,                  )
KELLEY PATTEN, and                   )
GENE GAMMONS,                        )
                                     )
            Defendants.              )

## <u>MEMORANDUM OPINION</u>

Before the Court is Defendants' Motion for Summary Judgment [Doc. 22]. Plaintiff filed a response [Doc. 42], and defendants replied [Doc. 50]. Thereafter, defendants filed a supplement [Doc. 75], plaintiff moved to strike defendants' supplement [Doc. 78], and defendants responded in opposition [Doc. 79]. Defendants also recently filed an expedited motion for oral argument on their motion for summary judgment [Doc. 95]. For the reasons explained below, defendants' motion for summary judgment [Doc. 22] will be **GRANTED**, plaintiff's motion to strike [Doc. 78] will be **DENIED**, defendants' expedited motion for oral argument [Doc. 95] will be **DENIED**, and this case will be **DISMISSED**.

## I.     Background

Prior to March 12, 2020, plaintiff Scott Gammons  was employed at defendant Adroit Medical Systems, Inc. ("Adroit") for 29 years [Doc. 42, p. 1]. He was vice president

and a minority shareholder of Adroit stock [*Id.* at 2]. Gene[1] Gammons is plaintiff's father and owns 80% of Adroit's stock. Gene was president of Adroit during plaintiff's 29-year tenure, and plaintiff reported directly to him [*Id.*].

Around 2019, plaintiff noticed that Gene's health and ability to run Adroit was declining [*Id.* at 2–4]. After Gene relied on others to run the business from January 2019 through March 2020, he was removed from office [*Id.* at 4]. The responsibilities he previously performed were assumed by plaintiff and defendant Kelley Patten. Kelley was Adroit's vice president of Operations and was responsible for Adroit's internal financial accounting. In addition to Gene, Kelley and her mother, Grazyna Gammons, were the only representatives of Adroit who had signature authority on Adroit's bank account [*Id.*]. Grazyna is Gene's wife and plaintiff's stepmother [Doc. 1, ¶ 16]. Prior to March 11, 2020, Grazyna was employed by Adroit in a non-managerial capacity and served on Adroit's Board of Directors with plaintiff and Gene [*Id.*].

In July 2019, plaintiff began to learn of financial transactions within Adroit that made him suspicious of financial impropriety by Grazyna, Kelley, and Adroit [Doc. 42, p. 4]. Specifically, plaintiff discovered folders in Adroit's financial records containing issues related to monthly employee expense reports for Grazyna and Kelley from 2017 to 2019 [*Id.* at 4–6; Docs. 42-15, 42-16, 42-17, 42-18]. Plaintiff eventually confirmed from Adroit payroll records that these expense payments were not being reported as wages by

---

[1] Due to the familial relationships among the parties, unless otherwise specified, this memorandum opinion will refer to an individual by their first name.

Adroit [Doc. 42, p. 6]. As a result, plaintiff concluded that none of these expenses were reported to the Internal Revenue Service ("IRS") and that Adroit was violating federal tax law [*Id.* at 7]. Plaintiff further believed that by acting in their roles on behalf of Adroit and by failing to report the expense payments as income on their personal income tax returns, Grazyna and Kelley were potentially committing tax fraud, theft, and embezzlement [*Id.*].

In addition to these monthly expense reports, plaintiff also discovered that several of Grazyna's personal credit card accounts were carried on Adroit's financial records as vendor accounts [*Id.* at 8]. As Adroit vendors, plaintiff found that Grazyna's and Kelley's personal purchases on these credit cards were being processed through Adroit's accounts payable system and paid by Adroit [*Id.* at 8–9; Doc. 42-19]. Plaintiff did not find that Grazyna or Kelley had reimbursed Adroit for these payments, and some were paid in full by Adroit [Doc. 42, pp. 9–10].

Moreover, plaintiff discovered that Adroit's Production Engineer, Jamie Nix, was working at Gene and Grazyna's personal residence remodeling a bathroom [*Id.* at 11]. Plaintiff observed Jamie arrive for work at Adroit, leave, and then return to Adroit shortly before the end of the workday. Plaintiff reviewed Adroit's payroll records and confirmed that Jamie was performing this personal work while he was being paid wages by Adroit. Furthermore, plaintiff discovered evidence that Adroit was paying Loudon County real estate property taxes on real estate personally owned by Gene and Grazyna [*Id.*].

In the fall of 2019, plaintiff discovered that Adroit was removing files of financial records from its business offices and preparing to burn them [*Id.* at 12]. Plaintiff located

the documents to be destroyed in a utility vehicle. He rode with Jamie to the burn pit and observed him throw the documents into the fire. Adroit's banking records for the past seven years were stored on CD storage media at Adroit. On the same day plaintiff observed the financial records being burned, he returned to Adroit to determine if the banking records CDs were still available. He discovered that they were all missing. Adroit's document retention policy requires retention of business records for 7 years [*Id.*].

Around December 2019 or January 2020, Kelley accused plaintiff of removing copies of her employee expense reports from the Adroit business office [*Id.*]. Afterwards, Kelley and her husband moved 40 to 50 banker boxes of financial records overnight out of their usual storage location into another building and were placed under lock [*Id.* at 12–13]. Previously, these financial records were kept in the business offices and were openly available to plaintiff [*Id.* at 13]. Shortly after, plaintiff's access to Adroit's computer financial records was terminated [*Id.*].

Before plaintiff's computer access was denied, he obtained copies of the 2019 W-2 forms for 2019 for several Adroit employees, including Grazyna, Kelley, and Gene [*Id.*; Doc. 42-17]. These records contained amounts listed as wages that were either identical to or closely approximate to their annual salaries listed on the Adroit Payroll Earnings report for the first pay period in 2019 [Doc. 42, p. 13; Doc. 42-18]. This confirmed to plaintiff that for 2019, like 2018, the payments made to the individual defendants other than regular payroll were not lawfully reported as taxable wages and

4

probably not reported as income subject to federal income taxation by Grazyna, Kelley, and Gene [Doc. 42, p. 13].

On several occasions in January 2020, plaintiff spoke on the phone with an IRS agent about the transactions involving Adroit and the individual defendants [Doc. 42-1, ¶ 46]. On January 23, 2020, he met with representatives of the IRS Criminal Investigation Unit to discuss defendants' activities that he believed to be embezzlement, theft, and income tax fraud [*Id.* ¶¶ 45, 47].

On March 4, 2020, plaintiff filed a petition in the Loudon County, Tennessee Probate Court to be appointed emergency conservator for Gene and to act in his corporate capacity as president and majority shareholder of Adroit [*Id.* ¶ 48; Doc. 23-2]. Plaintiff states that he filed the petition due to his concerns about Grazyna and Kelley taking advantage of Gene's declining health by employing the scheme that plaintiff had discovered, thereby exposing Adroit to potential liability for income tax fraud and other violations of federal tax laws [Doc. 42, p. 14]. On March 5, 2020, an order was entered appointing plaintiff the emergency conservator for Gene [*Id.*].

Defendants allege that the real reason for plaintiff's filing of the petition was due to the Notice of Special Meeting of Shareholders that Adroit mailed on March 4, 2020 [Doc. 23, p. 3; Doc. 23-1]. Attached to this notice was a proposed amendment to the company bylaws, reflecting that Grazyna would be elected the new president on March 11, 2020 [Doc. 23, p. 3; Doc. 23-1]. Defendants allege that the petition was plaintiff's attempt at "a hostile corporate takeover through the court system" [Doc. 23, p.4].

5

On March 7, 2020, plaintiff met with the individual defendants outside Adroit's offices and refused them access to the building [Doc. 42, p. 14]. Plaintiff states that he told the individual defendants that he had reported Adroit, Grazyna, and Kelley to the IRS for tax fraud [*Id.*]. In addition, he told them that IRS agents would be at Adroit on March 9, 2020, as part of an IRS audit and that Grazyna and Kelley were being investigated for embezzlement and tax evasion [*Id.* at 15]. Plaintiff also informed them that they were suspended pending the outcome of a financial audit related to the matters reported to the IRS. Plaintiff claims that he explained the involvement of the IRS to Grazyna and Kelley and told them the seriousness of the matter [*Id.*].

On March 9, 2020, plaintiff states that he met with Adroit managers to tell them that he had discovered financial irregularities at Adroit involving Grazyna and Kelley [*Id.*]. He told them that he contacted state law enforcement and the IRS about possible theft, embezzlement, and income tax violations. He also told them that IRS agents would be in the office later that morning. Later that morning, plaintiff reports that two IRS agents arrived at Adroit, and plaintiff escorted them to Kelley's office where they copied her computer hard drive [*Id.*].

In addition to these acts, defendants allege that plaintiff took several other actions while he was acting on behalf of Gene under the emergency conservatorship [Doc. 23, p. 5]. First, he removed Grazyna as board member and officer and elected his own wife, brother, and sister as board members and/or officers of Adroit [*Id.*; Doc. 23-5]. Second, he cancelled the special shareholders' meeting scheduled for March 11, 2020 [Doc. 23,

6

p. 5; Doc. 23-5]. Third, he changed the locks on Adroit's business offices and employed a Loudon County Sheriff's Deputy to deny the individual defendants access to the building [Doc. 23, p. 5]. Fourth, he personally delivered suspension-with-pay letters to Grazyna and Kelley [*Id.*]. Finally, he conducted a series of meetings in which he informed employees that he was now in charge of Adroit. Defendants contend that these actions caused unrest with employees, disrupted normal operations, and irreparably damaged the relationship between plaintiff and his family [*Id.*].

On March 10, 2020, the Loudon County Probate Court set aside the emergency conservatorship order and held that plaintiff no longer had authority to act on behalf of his father [*Id.* at 4; Doc. 23-4]. The court found that Grazyna appeared to have the authority to act on behalf of Gene and was acting in his best interests [Doc. 23, p. 4; Doc. 23-4, p. 2]. On March 11, 2020, Gene restored his rights as 80% shareholder of Adroit, exercised his majority shareholder rights to appoint a new Board of Directors through written consent, and replaced those previously appointed as the Board of Directors by plaintiff [Doc. 23, p. 6; Doc. 23-12]. The new board members were identified and told to appear for their first board meeting in a matter of only a few hours [Doc. 42, p. 16]. The previous Board of Directors included plaintiff, Gene, and Grazyna [*Id.*]. However, by written consent of the shareholders, the new Board of Directors consisted of Grazyna, Gene,[2] Kelley, Sammie Nix, Edward Tymitz, and Clarence Patten [*Id.* at 16–17; Doc. 23-12].

_____

[2] Gene's name listed on documents submitted by the parties is "Clifford E. Gammons" [*See* Doc. 23-12].

7

By a separate written consent, the new Board of Directors removed Gene as president and plaintiff as vice president [Doc. 42, p. 17]. Grazyna was elected to serve as president, and Kelley was elected vice president [Doc. 23-13]. Following its action by written consent, the Board of Directors held its annual meeting, voted unanimously to terminate both plaintiff and his brother for cause, and directed the former and current presidents to notify plaintiff of his termination [Doc. 23, p. 7; Doc. 23-14].

On March 12, 2020, plaintiff received a letter signed by Grazyna, as the current president, and Gene, as the outgoing president, stating that plaintiff's employment with Adroit had been terminated effective immediately for cause [Doc. 42, p. 17; Doc. 42-23]. Plaintiff also received a separation notice from Adroit confirming his discharge was for cause, but he was never informed of what the cause for his discharge was [Doc. 42, p. 17; Doc. 42-24].

Defendants allege that the Board of Directors unanimously voted to terminate plaintiff due to his poor attendance, attitude, performance, and most importantly, his attempted "coup" of the company [Doc. 23, p. 7; Docs. 23-6, 23-7, 23-8, 23-9, 23-10, 23-11]. Defendants maintain that plaintiff's attempted takeover of the company ruined his ability to work cooperatively with his family [Doc. 23, pp. 7–8].

However, plaintiff alleges that the reason for his termination was due to his reports of Adroit, Kelley, and Grazyna to the IRS [Doc. 1, ¶¶ 58–59, 67, 73–75, 80, 86]. Plaintiff contends that he could not have been terminated for his poor job performance because no officer, director, or employee of Adroit ever informed him that his job performance was

poor [Doc. 42, p. 2].  He states that the areas of Adroit's business over which he had primary responsibility were successful and profitable.  Plaintiff maintains that the only feedback he ever received from Gene concerning his job performance was positive.  He states that he never received any discipline or counseling regarding his hours of work, his absences from the office, or any other aspect of his job performance [*Id.*].  In fact, plaintiff reports that Gene awarded him a $10,000 bonus in November 2019 [*Id.*; Doc. 42-1, p. 18].

Plaintiff filed this action on May 5, 2021 [Doc. 1].  In his complaint, plaintiff asserts five claims: (1) violation of the Taxpayer First Act ("TFA") against all defendants; (2) violation of the Tennessee Public Protection Act ("TPPA") against Adroit; (3) intentional interference with at-will employment against Kelley, Grazyna, and Gene; (4) intentional interference with prospective economic advantage against Kelley, Grazyna, and Gene; and (5) civil conspiracy against Kelley, Grazyna, and Gene [*Id.* at ¶¶ 54–86].

## II.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party.  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  As such, the moving party has the burden of conclusively showing the lack of any genuine issue of material fact.  *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979).  To successfully oppose a motion for summary judgment, "[t]he non-moving party . . . must present

9

sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 252 (1986)).

## III. Analysis

### A. Plaintiff's Motion to Strike

After filing their motion for summary judgment, defendants filed a supplement to their motion pursuant to Local Rule 7.1(d) to call the Court's attention to plaintiff's deposition testimony, which was taken after final briefing on the motion for summary judgment [Doc. 75]. Plaintiff thereafter filed a motion to strike defendants' supplement, arguing that Rule 7.1(d) cannot be interpreted broadly enough to include discovery that was obtained weeks after the Court entered the briefing schedule on the motion [Doc. 78]. Specifically, plaintiff argues that in Rule 7.1(d), the word "developments" is generally understood to mean "recent judicial decisions or late received discovery responses from an adversary party" [*Id.* at 3]. Defendants respond that their supplement is timely and within the parameters of Local Rule 7.1(d) [Doc. 79].

Local Rule 7.1(d) states:

No additional briefs, affidavits, or other papers in support of or in opposition to a motion shall be filed without prior approval of the Court, except that a party may file a supplemental brief of no more than 5 pages to call to the Court's attention developments occurring after a party's final brief is filed.

*See* E.D. Tenn. L.R. 7.1(d). Nowhere in this rule is the word "developments" limited to "recent judicial decisions or late received discovery responses from an adversary party" [Doc. 78, p. 3]. Indeed, in the Court's Scheduling Order, the deadline for dispositive

10

motions is before the deadline for the completion of discovery [Doc. 20, pp. 3, 6]. As a result, the word "developments" could feasibly incorporate deposition testimony that is taken after final briefing on a dispositive motion.

Moreover, the Court agrees with defendants that during the duration of this case, plaintiff has requested extensions of time to conduct further discovery and supplement his response to defendants' motion for summary judgment. Therefore, plaintiff's request to strike defendants' supplement to their motion that directs the Court's attention to additional discovery obtained after final briefing, is not well taken. Thus, plaintiff's motion to strike [Doc. 78] will be **DENIED**, and the Court will consider plaintiff's deposition testimony as supplemented by defendants [Doc. 75] in its analysis of defendants' motion for summary judgment [Doc. 22].

### B.    TPPA

The TPPA provides, "No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). The TPPA was intended to provide "statutory protection to employees whose actions served to deter, expose, and stop organizational wrongdoing[, and] essentially codified the common-law cause of action for retaliatory discharge[.]" *Williams v. City of Burns*, 465 S.W.3d 96, 109–10 (Tenn. 2015). For a plaintiff to maintain a TPPA claim, the plaintiff must show:

> (1) the plaintiff's status as an employee of the defendant; (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; [and] (4) an exclusive causal

11

relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

*Treadaway v. Big Red Powersports, LLC*, 611 F. Supp. 2d 768, 783 (E.D. Tenn. 2009) (internal quotation marks omitted). To prove a claim under the TPPA, a plaintiff must establish that retaliation was the defendant's sole motivation for discharging him, and therefore, even if direct evidence establishes that retaliation was a substantial motivating factor, that does not end the inquiry. *Williams*, 465 S.W.3d at 113, n.16.

Tenn. Code Ann. 50-1-304(f) sets forth a statutory burden-shifting framework to be applied to TPPA claims. *Id.* at 112, n.15. This analytical framework is "virtually indistinguishable" from the familiar *McDonnell Douglas*[3] burden-shifting framework. *Id.*

Under this framework, plaintiff first bears the burden of proving a prima facie case under the TPPA, and, if he does so, he creates a rebuttable presumption that his employer unlawfully retaliated against him. *Id.* at 112 (quoting *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 780–81 (Tenn. 2010)). The burden then shifts to the defendant to come forward with a legitimate, non-retaliatory reason for its actions. *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 797 (M.D. Tenn. 2010). If defendant articulates a legitimate, non-retaliatory reason for its discharge of plaintiff, the burden shifts back to plaintiff to show that the proffered reasons are pretextual. *Id.*

Given plaintiff's reliance on circumstantial evidence [Doc. 42, p. 19], the Court will first analyze whether plaintiff has submitted evidence from which a reasonable jury could

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

12

conclude that he has established a prima facie case of retaliation. The burden of establishing a prima face case is not onerous. *Williams*, 465 S.W. 3d at 113. To establish a prima facie claim of retaliation under the TPPA, a plaintiff "must demonstrate that he engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the defendant thereafter discharged him, and that there was the requisite causal connection between the protected conduct and the discharge." *Id.*

There seems to be no dispute between the parties that plaintiff's reports to the IRS constitute a protected activity and that plaintiff was discharged after he made the reports. Thus, the Court will only consider whether there are genuine issues of material fact as to the remaining two elements.

### 1. Knowledge

As to the element of knowledge, defendants contend that plaintiff did not alert anyone in July 2019 of his discovery of embezzlement [Doc. 23, p. 16]. They assert that the first time plaintiff mentioned the alleged embezzlement or the purported IRS reports to anyone at Adroit was when he served his father with the petition for an emergency conservatorship on March 7, 2020 [*Id.*; Doc. 23-6, ¶ 5]. However, defendants argue that during this time, they were not focused on plaintiff's IRS reports, as they were solely focused on regaining Gene's liberty and removing the emergency conservatorship. They also claim that they did not learn about plaintiff's IRS reports during the hearing on the emergency conservatorship because the state court excluded any evidence of plaintiff's IRS reports as irrelevant [*Id.*]. Accordingly, defendants argue that no one on the Board of

13

Directors knew about or discussed plaintiff's IRS reports when they unanimously voted to terminate him [*Id.* at 17–18; Docs. 23-6, 23-7, 23-8].

Plaintiff responds that defendants had knowledge about his reports to the IRS no later than March 7, 2020, after they met with plaintiff outside Adroit's offices and were advised that plaintiff had reported Adroit, Grazyna, and Kelley to the IRS [Doc. 42, pp. 22–23; Doc. 42-8; Doc. 42-9]. Plaintiff also argues that in response to the news of the IRS reports, Grazyna commented that the matter was very serious [Doc. 42, p. 23; Doc. 42-1, ¶ 52]. Plaintiff further contends that Grazyna and Kelley were present at the conservatorship hearing where counsel for Gene repeatedly discussed plaintiff's IRS reports in his objections to the introduction of any testimony about them [Doc. 42, p. 23; Doc. 42-13].

Defendants reply that plaintiff's claimed IRS reports were a minor part of the emergency conservatorship itself [Doc. 50, p. 4]. In addition, defendants argue that the declarations of the directors show that they did know whether plaintiff had made a report to the IRS and voted to terminate him because of the emergency conservatorship [*Id.*]. Second, the testimony of Grazyna and Kelley only shows that plaintiff announced his reports to the IRS on March 7, 2020 [*Id.* at 4–5]. Third, defendants state that the evidence does not establish that Grazyna or Kelley heard or understood the evidence that was excluded at the conservatorship hearing [*Id.* at 5].

Although defendants claim that their reason for terminating plaintiff could not have been based on the IRS reports because they had no knowledge of the reports, they concede

that they were made aware of plaintiff's reports to the IRS when Gene was served with the conservatorship papers on March 7, 2020, which was four days prior to plaintiff's termination on March 11, 2020 [Doc. 23, pp. 16–17; Doc. 23-6, ¶ 5; Doc. 23-13; Doc.23-14]. In addition, defendants admit in their depositions that on March 7, 2020, they had a conversation with plaintiff where he informed them that he had reported them to the IRS [Doc. 42-8, pp. 30–32; Doc. 42-9, pp. 45–46].

Defendants attempt to minimize their knowledge of the IRS reports, but the evidence supports that defendants had knowledge of the IRS reports before they chose to terminate plaintiff. As a result, a genuine dispute of material fact exists as to defendants' knowledge of plaintiff's reports to the IRS.

## 2. Causal Connection

As for the element of causal connection, defendants point to plaintiff's deposition testimony to argue that plaintiff was not present, did not overhear, and has no personal knowledge of the discussion of decisions resulting in his termination [Doc. 23, p. 12; Doc. 75, p. 1; Doc. 75-1]. Defendants contend that the corporate documents confirm that plaintiff was not present for any portion of the events leading up to his termination [Doc. 23, p. 13; Docs. 23-12, 23-13, 23-14, 23-17]. Defendants further rely on their argument that they had no knowledge of the IRS reports, and that even if plaintiff could show knowledge, temporal proximity alone is insufficient for a prima facie case of retaliation [Doc. 23, pp. 13–14].

15

Plaintiff responds that he was discharged only four days after he first informed defendants of his reports to the IRS [Doc. 42, p. 24]. Plaintiff concedes that temporal proximity alone is insufficient to establish the causal connection requirement of a prima facie case under the TPPA [*Id.* at 25]. However, plaintiff points to other evidence of retaliatory conduct that he believes is sufficient to establish a causal connection [*Id.*].

Specifically, plaintiff points to Kelley's text messages with her husband, Clarence, in January 2020 about a complaint to Adult Protective Services concerning Gene [*Id.*; Doc. 42-25]. In this conversation, Kelley and Clarence assumed the report was made by plaintiff as a means to take over Adroit [Doc. 42, p. 25]. Thus, plaintiff contends that defendants suspected that he made a report to another law enforcement agency in an effort to take over the company in January 2020, yet the record is devoid of any evidence that they did anything in response. However, when another effort to take over the company was made in March 2020, coupled with his reports to the IRS, immediate termination followed [*Id.*].

Defendants reply that there is no proof that anyone at Adroit considered or acted upon plaintiff's claimed report to the IRS, and temporal proximity alone is insufficient to establish a prima facie case [Doc. 50, pp. 5–6]. Defendants contend the passage of time between March 7th and March 11th might be relevant to establishing a causal connection if plaintiff had communicated his reports to the IRS to defendants, but plaintiff did not inform anyone at Adroit of his reports until he served his father with a petition for an emergency conservatorship [*Id.* at 6]. Defendants contend that plaintiff has put forth

16

nothing more than speculation to support his claim that he was terminated due to his IRS reports rather than his attempted hostile takeover of Adroit [*Id.*].

Temporal proximity "between the protected act and the discharge is not sufficient to establish a causal relationship" for purposes of a TPPA claim. *Smith*, 730 F. Supp. 2d at 800 (quoting *Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn. 1997)). "However, the Court may consider temporal proximity, combined with other circumstantial evidence, in evaluating whether plaintiff has established a causal connection for purposes of his prima facie case." *See Boyd v. Youth Opportunity Invs., LLC*, No. 3:20-cv-321, 2022 WL 3205013, at *9 (E.D. Tenn. Aug. 8, 2022).

Here, the record reflects that plaintiff made his reports to the IRS in January 2020 [Doc. 42-1, ¶¶ 46–47]. Defendants learned about these reports from plaintiff on March 7, 2020 [Doc. 23-6, ¶ 5; Doc. 42-8, pp. 30–32; Doc. 42-9, pp. 45–46]. Plaintiff was terminated on March 11, 2020 [Doc. 23-13; Doc. 23-14; Doc. 42-23]. Thus, the four days that separated defendants' knowledge of plaintiff's IRS reports and plaintiff's termination is some evidence supporting a causal connection in this case. *See Boyd*, 2022 WL 3205013, at *9.

The only other piece of evidence plaintiff points to in his brief to support a causal connection is the text communications between Kelley and Clarence concerning their knowledge in January 2020 that plaintiff may have reported Gene to Adult Protective Services. However, nothing in the texts between Kelley and Clarence create a causal

connection between plaintiff's reports to the IRS and his termination. In fact, these text messages make no mention of the IRS reports.

Based on plaintiff's argument, it seems that he is interposing causal connection with pretext. Essentially, plaintiff is arguing that because defendants believed in January 2020 that he was attempting to take over the company and did not take any action then, they cannot now claim that they fired him in March 2020 for an attempted takeover of the company. However, this is the exact type of argument that would be used to support pretext.

Before reaching the pretext prong of *McDonnell Douglas*, though, plaintiff must first put forth direct or circumstantial evidence connecting his IRS reports to his termination. *See Boyd*, 2022 WL 3205013, at *9 (finding a genuine dispute of material fact as to causal connection where an interrogatory response listed complaints and grievances as one of the reasons for the plaintiff's termination); *Williams*, 465 S.W.3d at 114–15 (finding a causal connection where the plaintiff received an irate written warning from his employer following the news of his protected activity). Plaintiff's sole reliance on the texts between Kelley and Clarence fails to make this connection.

In the absence of such evidence, all plaintiff is left with is his evidence of temporal proximity, which standing alone, is insufficient to establish a causal connection for his TPPA claim. *See Smith*, 730 F. Supp. 2d at 800 (quoting *Mason*, 942 S.W.2d at 473) ("[P]roximity in time between the protected act and the discharge is not sufficient to establish a causal relationship."). As a result, defendants have demonstrated that no

18

genuine dispute of material fact exists as to the causal connection element of plaintiff's TPPA claim, and defendants' motion for summary judgment will be **GRANTED** as to this claim. *See Jordan v. Mathews Nissan, Inc.*, 539 F. Supp. 3d 848, 868 (M.D. Tenn. 2021) (stating that a defendant can obtain summary judgment on a claim based on indirect evidence when it shows "that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's prima facie case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element)").

C.    **TFA**

The TFA forbids an employer from retaliating against an employee:

> for any lawful act done by the employee . . . to provide information . . . regarding underpayment of tax or any conduct which the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud, when the information or assistance is provided to the Internal Revenue Service[.]

26 U.S.C. § 7623(d)(1)(A).

An action brought pursuant to the "anti-retaliation whistleblower" provision of the TFA is governed by the legal burdens of proof in 49 U.S.C. § 42121(b). 26 U.S.C. § 7623(d)(2)(B)(iii). The parties seem to agree that like the TPPA, some form of *McDonnell Douglas* standard applies to claims under the TFA [Doc. 23, pp. 9–10; Doc. 42, p. 19]. However, as plaintiff points out, the TFA modifies the burden-shifting framework of *McDonnell Douglas* as it applies to TFA claims in two ways. First, the TFA requires a plaintiff to demonstrate that the protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C. § 42121(b)(2)(B).

19

Second, an employer can rebut the plaintiff's prima facie case of retaliation "if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Id.* With these two modifications in mind, the Court will apply the *McDonnell Douglas* burden-shifting framework to plaintiff's TFA claim.

Because the analysis for the first three elements of the prima facie case for a TFA claim is the same as for a TPPA claim, the Court incorporates its reasoning from Section III.B for the first three elements. The only remaining element of plaintiff's prima facie case is the causal connection element.

As already mentioned, the standard for establishing a causal connection for a TFA claim is that the protected activity must have been a contributing factor in the decision to terminate plaintiff. *See* 49 U.S.C. § 42121(b)(2)(B). The Sixth Circuit has stated that "the contributing factor standard has been understood to mean any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 338 (6th Cir. 2014) (internal quotation marks omitted).[4]

The parties dispute whether temporal proximity alone can serve as the basis for the contributing factor element of a TFA claim. The Court is not aware of any Sixth Circuit authority addressing this specific issue as it corresponds to the TFA. However, the TFA is

---

[4] The decision in *Consol. Rail Corp.* was made in the context of a retaliation claim asserted under the Federal Rail Safety Act, which also incorporates the burdens of proof from 49 U.S.C. § 42121(b). *See* 49 U.S.C. § 20109(d)(2)(A); *Consol. Rail Corp.*, 567 F. App'x at 337.

20

not the only federal statute that expressly incorporates the burdens of proof from 49 U.S.C. § 42121(b). *See, e.g.*, Federal Rail Safety Act, 49 U.S.C. § 20109(d)(2)(A). Thus, in order to determine whether temporal proximity alone can serve as the basis for the contributing factor element of a TFA claim, the Court will look to other cases in the Sixth Circuit where courts have decided claims based on these same burdens of proof.

District courts in the Sixth Circuit have uniformly looked at various types of circumstantial evidence, including temporal proximity, in deciding whether the plaintiff's protected activity was a contributing factor in the defendant's termination decision. *See Bostek v. Norfolk S. Ry. Co.*, No. 3:16-cv-2416, 2019 WL 2774147, at *5 (N.D. Ohio July 2, 2019); *Gibbs v. Norfolk S. Ry. Co.*, No. 3:14-cv-587, 2018 WL 1542141, at *8 (W.D. Ky. Mar. 29, 2018); *Wallender v. Canadian Nat'l Ry. Co.*, No. 2:13-cv-2603, 2015 WL 10818741, at *20 (W.D. Tenn. Feb. 10, 2015). However, whether courts will rely on temporal proximity alone to establish that the protected activity was a contributing factor is not uniform. *See Burton v. Food Giant Supermarkets, Inc.*, No. 1:19-cv-2445, 2021 WL 3574885, at *9–10 (W.D. Tenn. Aug. 12, 2021) (declining to rely on temporal proximity alone where an intervening event occurred that formed the basis for termination); *Bostek*, 2019 WL 2774147, at *5 (analyzing multiple factors in addition to temporal proximity); *Gibbs*, 2018 WL 1542141, at *8 (declining to rely on temporal proximity alone where an intervening event occurred that independently justified adverse action); *Wallender*, 2015 WL 10818741, at *21 (allowing temporal proximity alone to establish that the plaintiff's protected activity was a contributing factor).

21

Several Sixth Circuit decisions have addressed claims relying on the burdens of proof from 49 U.S.C. § 42121(b). In *Riddle v. First Tennessee Bank*, the Sixth Circuit stated that "temporal proximity alone is usually insufficient to constitute evidence that would prove that an employer retaliated against an employee for engaging in alleged protected activity." 497 F. App'x 588, 596 (6th Cir. 2012). The court found that four months was not sufficient to establish that the plaintiff's protected activity was a contributing factor to his termination because four months was "not so strong [] to carry the day by itself and no other evidence weighs in favor of finding a causal connection for [plaintiff]'s retaliation claim." *Id.*

In *Consolidated Rail Corporation*, the court did not rely on temporal proximity at all and found that an employer's reaction following the news of plaintiff's protected activity was "substantial evidence that animus was a contributing factor in [plaintiff]'s termination." 567 F. App'x at 338. And in *Mangold v. Norfolk Southern Railway Company*, the Sixth Circuit declined to rely on temporal proximity alone for three reasons. No. 21-3059, 2021 WL 5904091, at *5 (6th Cir. Dec. 14, 2021). First, the court found that the plaintiff had not demonstrated that the decisionmakers had knowledge about his protected activities. *Id.* Second, hearings regarding the plaintiff's rule-breaking were held, which the court found served as an intervening event that independently justified adverse disciplinary action. *Id.* Third, the plaintiff provided no evidence that the final decisionmakers' decision to terminate him was based on his protected activity. *Id.*

22

Based on the foregoing authority, the Court finds that temporal proximity, standing alone, cannot give rise to an inference of causal connection for purposes of plaintiff's TFA claim.[5]  Moreover, the facts of this case are similar to those cases in which courts declined to rely on temporal proximity alone because an intervening event occurred that independently justified adverse action.  *See Mangold*, 2021 WL 5904091, at *5; *Burton*, 2021 WL 3574885, at *9–10; *Gibbs*, 2018 WL 1542141, at *8.  The record demonstrates that on the same day plaintiff informed defendants of his reports to the IRS, he also served his father with emergency conservatorship papers, and then took actions affecting Adroit's business and structure [Doc. 23-5; Doc. 23-6, ¶ 5; Doc. 42-8, pp. 30–32; Doc. 42-9, pp. 45–46].  Shortly thereafter, the emergency conservatorship was overturned finding that plaintiff was not trying to act in Gene's best interests and had failed to meet his burden that a conservatorship was needed over Gene or his corporate capacity [Doc. 23-3, p. 14; Doc. 23-4, p. 1].   Based on this evidence, the Court finds that the emergency conservatorship was an intervening event that could have justified adverse employment action on its own.

---

[5]  In support of his argument that temporal proximity alone is sufficient for a claim under the TFA, plaintiff has cited to several Sixth Circuit cases.  However, these cases do not appear to address claims that incorporate the burdens of proof from 49 U.S.C. § 42121(b) or address the contributing factor element.  *See Frazier v. Richland Pub. Health*, 685 F. App'x 443 (6th Cir. 2017) (retaliation under Title VII and Ohio law); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) (retaliation under Age Discrimination in Employment Act); *McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960 (6th Cir. 2004) (retaliation under Federal Credit Union Act); *Shefferly v. Health All. Plan of Michigan*, 94 F. App'x 275 (6th Cir. 2004) (retaliation under Title VII, Elliot-Larsen Civil Rights Act, Americans with Disabilities Act, and Michigan Persons with Disabilities Civil Rights Act).

23

The Court notes that the four days between defendants gaining knowledge of plaintiff's reports to the IRS and his termination serves as some circumstantial evidence that his reports were a contributing factor to defendants' decision to terminate him. However, the only other evidence plaintiff has pointed to in support of a causal connection is the text messages between Kelley and Clarence [Doc. 42-25]. However, as previously explained, these text messages make no connection between plaintiff's IRS reports and his termination, as they make no mention of any reports to the IRS at all. In addition, they do not demonstrate any animus toward plaintiff due to his reports to the IRS or that the directors' decision to terminate him was based on his reports to the IRS.[6] *Cf. Mangold*, 2021 WL 5904091, at *5 (finding no evidence that the final decisionmakers' decision to terminate plaintiff was based on his protected activity); *Consol. Rail Corp.*, 567 F. App'x at 338 (finding animus where the employer flicked safety reports at the plaintiff, requested him to quit sending in safety reports, and asked him why he still worked there).

Based on the forgoing, the Court finds that plaintiff has not met his burden to produce evidence from which a reasonably jury could find that his IRS reports were a contributing factor in defendants' decision to terminate him. As a result, defendants' motion for summary judgment will be **GRANTED** as to plaintiff's TFA claim. *See Jordan*, 539 F. Supp. 3d at 868.

---

[6] In a separate part of plaintiff's brief, he explains that in response to the news of the IRS reports, Grazyna stated that the matter was "serious" [Doc. 42, p. 23; Doc. 42-1, ¶ 52]. However, Grazyna's response that the reports were "serious" does not demonstrate that she possessed animus toward plaintiff because of the reports or that she took the reports into consideration when deciding to terminate plaintiff.

### D. Intentional Interference with At-Will Employment

Defendants contend they are entitled to summary judgment on plaintiff's claim for intentional interference with at-will employment because plaintiff was not an at-will employee [Doc. 23, p. 23]. Defendants contend that before his termination, plaintiff was the vice president of Adroit, and as a result, the Amended Bylaws governed his employment [*Id.*]. Defendants state that the Amended Bylaws provide that officers are elected for one-year terms that automatically end unless the Board of Directors votes to reelect the officer for another year [*Id.*; Doc. 23-17]. Defendants assert that although officers can be terminated during their one-year term, they have no right to continued employment for more than one year, and there is no guarantee that their position as an officer will be renewed [Doc. 23, pp. 23–24]. They contend that at-will employees have indefinite employment that lasts unless and until they are terminated, but plaintiff's employment was for a definite period unless and until it was extended through a renewal vote [*Id.* at 24].

Plaintiff responds that defendants have ignored the legal distinction between the role of a corporate officer and an employee [Doc. 42, p. 31]. He claims that the fact that Adroit's bylaws limited the term of corporate officers to one year does not foreclose a separate analysis of plaintiff's termination as an employee [*Id.* at 32]. Plaintiff further argues that Adroit's corporate records indicate that its directors undertook separate actions to remove plaintiff as an officer and then terminate his employment [*Id.*]. Plaintiff asserts that by referring to him as "former officer," the directors recognized a distinction between

25

his two positions [*Id.*; Doc. 42-22]. As a result, plaintiff maintains that any term of office relative to his position as officer has no bearing on his separate status as an employee [Doc. 42, p. 32]. Plaintiff further urges that in the absence of evidence to the contrary, employees in Tennessee are presumed to be at-will employees [*Id.*].

"Under the employment-at-will doctrine, employment is for an indefinite period of time and may generally be terminated by either the employer or the employee at any time, for any reason, or for no reason at all." *Keller v. Casteel*, 602 S.W.3d 351, 358 (Tenn. 2020). "In the absence of evidence to the contrary, employees in Tennessee are presumed to be at-will." *Id.*

While some states recognize a distinction between officers and employees, Tennessee is not one of them. *See* Tenn. Code Ann. § 48-11-201(16) (defining an "employee" to include an officer); *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 571 n.26 (D. Del. 1993).

Here, there is no dispute between the parties that before plaintiff's termination, he was an officer of Adroit. [Doc. 23, p. 3; Doc. 42, p. 2]. Adroit's Amended Bylaws state, "Each Officer shall hold office until the regular meeting of the Board of Directors following the annual election of Directors in the next subsequent year and until his successor shall have been duly elected and shall have qualified, or until his earlier resignation, removal from office or death" [Doc. 23-17, pp. 9–10]. Plaintiff seems to concede that his position as an officer only lasted for one year [Doc. 42, p. 32]. Thus, because plaintiff's position as an officer (and employee) was for a definite term, he was

not an at-will employee. *See Petschonek v. Cath. Diocese of Memphis*, No. W2011–02216, 2012 WL 1868212, at *9 (Tenn. Ct. App. May 23, 2012) (finding the plaintiff to not be an employee at-will where she was employed under a contract for a definite term).

Nonetheless, plaintiff appears to further argue that he was an at-will employee due to his position, apart from being an officer, as an employee. He points to the separate actions the Board of Directors took to remove him as an officer and an employee, arguing that this demonstrates the directors recognized him both as an officer and an employee. In addition, he points to Adroit's Amended Bylaws, which state, "An Officer's removal does not affect the Officer's contract rights, if any, with the Corporation" [Doc. 23-17, p. 10]. However, plaintiff has not put forth any evidence demonstrating that in addition to his position as an officer, he had a separate employment contract with Adroit as an employee that was for an indefinite duration. Instead, the only evidence before the Court demonstrating that plaintiff was an employee of Adroit is that he served as an officer of Adroit for 29 years and that his term as an officer lasted for one year subject to annual renewal [*Id.* at 9–10]. Thus, the Court finds that there is no genuine dispute of material fact that plaintiff was not an at-will employee, and defendant's motion for summary judgment will be **GRANTED** as to plaintiff's claim for intentional interference with at-will employment.

### E. Intentional Interference with Prospective Economic Advantage

To state a claim for intentional interference with a prospective economic advantage, a plaintiff must show:

27

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citations omitted).[7]

Defendants argue that they terminated plaintiff with a proper motivation and for nonretaliatory reasons [Doc. 23, pp. 22–23]. They claim that they terminated plaintiff due to his continued trend of poor judgment and for placing his father under an emergency conservatorship in an attempt to takeover Adroit [*Id.* at 23]. As a result, they contend that the undisputed proof shows that the actions of the Board of Directors were proper and with valid justification [*Id.*].

Plaintiff responds that the facts used to support his retaliation claims allow a jury to conclude that defendants were acting out of motivation to benefit themselves personally from plaintiff's termination [Doc. 42, p. 30]. By terminating him, plaintiff contends that defendants served only themselves by preventing him from taking further actions to uncover more wrongful acts to deplete Adroit's assets [*Id.*]. He claims that the facts also allow a jury to conclude that defendants employed improper means or motive to affect his

---

[7] The Court notes that this tort is referred to as "the tort of intentional interference with business relationships." *Trau-Med*, 71 S.W.3d at 701. However, for purposes of this opinion, the Court will continue to refer to it as "intentional interference with a prospective economic advantage."

28

termination through (1) commission of the independent tort of intentional inference with at-will employment, (2) fraud of reconstituting the Board of Directors to create the appearance of an independent board decision, and (3) the breach of a fiduciary relationship by firing him to perpetrate and cover up self-dealing [*Id.* at 30–31]. Plaintiff argues that the evidence allows a jury to conclude that an independent Board of Directors did not decide to terminate him [*Id.* at 31].

Based on defendants' argument, it appears that they are only challenging the fourth element: improper motive or improper means. The Tennessee Supreme Court has explained this element in the following way:

> [A] determination of whether a defendant acted "improperly" or possessed an "improper" motive is dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term "improper" is neither possible nor helpful. However, with regard to improper motive, we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff. Moreover, in the attempt to provide further guidance, we cite the following methods as some examples of improper interference: those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition[.]

*Trau-Med*, 71 S.W.3d at 701 n.5 (internal citations omitted).

The Court first notes that plaintiff cannot rely on defendants' alleged commission of the tort of intentional interference with at-will employment as an improper means because the Court has already determined that plaintiff was not an at-will employee. And,

as to plaintiff's other proposed means of fraud and breach of fiduciary duty, plaintiff has pled neither as causes of action in this case. Nor has plaintiff produced sufficient argument or evidence tending to show that defendants committed fraud when they formed the new Board of Directors or that they owed him a fiduciary duty that was breached. Moreover, while plaintiff claims that defendants terminated him to prevent him from uncovering more wrongdoing, plaintiff has failed to present evidence connecting his termination to his reports to the IRS or to his discovery of the alleged wrongful acts. As a result, the Court finds that plaintiff has not demonstrated that defendants acted with improper means when they terminated him.

In addition, the Court does not find that defendants had an improper motive when they terminated him. Specifically, plaintiff has failed to produce sufficient evidence from which a jury could reasonably conclude that defendants' *predominant purpose* was to injure plaintiff. For example, in *Trau-Med*, the court found that the defendant's "predominant motive was to drive [the plaintiff] out of business for the sole purpose of limiting health care access to indigent claimants to control and limit [the defendant's] claims expenses." 71 S.W.3d at 702 (internal quotation marks omitted).

Here, defendants have produced some evidence that they fired plaintiff for reasons other than his reports to the IRS, such as his attempted takeover of the company and his poor performance and attendance [Docs. 23-6, 23-7, 23-8, 23-9, 23-10, 23-11]. While plaintiff seeks to call these reasons into question [Doc. 42-4, p. 10; Doc. 42-5, p. 3; Doc. 42-7], he has not presented evidence showing that defendants' *predominant purpose*

30

in firing him was to injure him. As a result, the Court finds that plaintiff has not demonstrated that defendants acted with an improper motive when they terminated him.

Based on the foregoing, defendants have demonstrated that there is no genuine dispute of material fact as to the fourth element of plaintiff's claim for intentional interference with a prospective economic advantage. Thus, defendants' motion for summary judgment will be **GRANTED** as to this claim.

F.     Civil Conspiracy

Defendants argue that because summary judgment is appropriate on plaintiff's first four claims, summary judgment must also be granted on plaintiff's conspiracy claim [Doc. 23, p. 25]. Specifically, they argue that because none of plaintiff's claims can survive, there is no underlying predicate tort to support plaintiff's conspiracy claim [*Id.*]. Plaintiff responds that his arguments as to his claims for intentional interference with at-will employment and intentional interference with prospective economic advantage demonstrate that defendants are not entitled to summary judgment on his civil conspiracy claim [Doc. 42, p. 33 n.12].

The Court has already determined that defendants are entitled to summary judgment on plaintiff's claims for intentional interference with at-will employment and intentional interference with prospective economic advantage. Because plaintiff's response indicates that he rests his conspiracy claim on these two claims, his conspiracy claim must also fail. *See Felts v. Paradise*, 158 S.W.2d 727, 729 (Tenn. 1942) ("It cannot be that a conspiracy to do a thing is actionable where the thing itself would not be.") (internal quotation marks

31

omitted). As a result, defendants' motion for summary judgment will be **GRANTED** as to plaintiff's conspiracy claim.

## IV. Conclusion

For the reasons set forth above, defendants' motion for summary judgment [Doc. 22] will be **GRANTED** as to all claims, plaintiff's motion to strike [Doc. 78] will be **DENIED**, defendants' expedited motion for oral argument [Doc. 95] will be **DENIED**, and this case will be **DISMISSED**. A separate order will follow.

ENTER:

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE